CRAWFORDS and SELLMAN *vs.* ROBERT TAYLOR, Trustee of FORD, *et al.*—*December,* 1834.

Under the insolvent laws of this State, the intent to give an undue prefer-ence by a debtor making a transfer of his property to a creditor or surety, is to be considered as subject to the distinctions which have obtained un-der the bankrupt laws of *England,* between a voluntary and involuntary transfer; and therefore to avoid a transfer under our system, it will be necessary to establish, that the debtor made the transfer with a view or expectation of taking the benefit of the insolvent law, and also that he voluntarily made the transfer sought to be vacated.

That transfer is not considered voluntary which is made to a creditor de-manding payment, although the debt is not due at the time the transfer was made.    The creditor is entitled to use vigilance, and obtain security, as well before, as after the debt is payable.

APPEAL from the court of Chancery.

Bills were filed on the 8th of January, the 22d of April, and the 13th July, 1831, by the appellee, *Taylor,* as per-

manent trustee of *Stephen H. Ford,* an insolvent petitioner, and others of *Ford's* creditors, against himself and *Hugh* and *William Crawford, James C. Sellman, John Franciscus,* and the *Commercial and Farmer's Bank of Baltimore,* for the purpose of setting aside certain conveyances and assignments to them, and placing the property and funds so conveyed and assigned in the hands of *Taylor,* the trustee, for distribution among the creditors, under the insolvent laws. The decree of the Chancellor, passed after the consolidation of the cases, was acquiesced in by *Ford, Franciscus* and the *Bank.*

The bill against the *Crawfords* (and the statements in the bill against *Sellman* are substantially the same) alleged; that *Ford* became insolvent and unable to pay his debts, about the 17th of May, 1830, and had then reason to believe, and did believe, that he would be compelled to take the benefit of the insolvent laws, unless he could get a discharge from his creditors, upon a surrender to them of his property. That being thus insolvent and unable to pay his debts, and expecting to be driven to the insolvent laws for relief, he did transfer and assign to the defendants, the *Crawfords,* in satisfaction of their claim against him, a large quantity of merchandize, and a considerable amount of notes and other evidences of debt. That said property and funds were transferred to the defendants, before their claims against the said *Ford* were due, and of his own mere motion, without solicitation or application to him by them; and that said transfers and assignments were made with a view, or under an expectation of being, or becoming, an insolvent debtor, and with an intent thereby to give an undue and improper preference to the said *Crawfords;*—that he actually applied for the benefit of the insolvent laws, on the 5th January, 1830. And they pray that the transfers and assignments so made, may be vacated, and the property and funds paid over to *Taylor,* the trustee, to be appropriated under the provisions of the insolvent laws.

The answers of the *Crawfords* and *Ford*, admitted his application for the insolvent laws at the time stated; and that on the 17th of May, 1830, as alleged, he sold and transferred to them, merchandize and funds in satisfaction of a claim against him, due the said *Crawfords*, for moneys advanced to him by them, and endorsements which they had made on his account, and in regard to which he had pledged himself at the time of the advances, &c. that they should in no event sustain any loss. They deny, that at the time these sales and transfers were made, *Ford* had discovered himself to be unable to pay his debts, or that they were made in contemplation of an application for the benefit of the insolvent laws, and with intent thereby to give an undue and improper preference to the said *Crawfords*. On the contrary *Ford* alleged, that he was then perfectly satisfied, that his business could be arranged, without recourse to such an expedient. The answer of *Ford* further stated, that in the fall of the year 1829, when his affairs were embarrassed, he was enabled to continue his business by the timely assistance of the *Crawfords*. The answers further stated, that the before mentioned sale and transfers, were made at the instance of the *Crawfords*, who state that they were constantly pressing for the payment of their cash advances and endorsements. That they received nothing on account of a balance due them by *Ford*, for merchandize previously sold him; and that the goods obtained from him were credited at the prices he paid for them. That the claim due the *Crawfords* was evidenced for the most part by promissory notes, which being renewals of others previously given, were not all due and payable at the time of the sale and transfers.

The proof taken under the commission, which is voluminous, is omitted, being as the reporters suppose sufficiently adverted to by the learned judge who delivered the opinion of this court.

*Bland*, (Chancellor,) on the 2d of January, 1833, declared the transfers and assignments to the *Crawfords* and

*Sellman* to be absolutely null and void, and that the title to the property so transferred and assigned, be vested in the trustee, *Taylor;* and that an account be stated by the auditor, &c. The account was accordingly stated, and duly ratified and confirmed by the Chancellor's order of the 24th of May, 1833, and the amount thus ascertained to be due, the trustee directed to be paid with costs. From these decrees an appeal was prosecuted by the *Crawfords* and *Sellman* to the court of Appeals.

The cause was argued before BUCHANAN, Ch. J., and STEPHEN, and CHAMBERS, J's.

*Johnson* and *Kennedy*, for the appellants.

1. The question to be decided by this court is, whether the transfers were made in contemplation of insolvency, and for the purpose of giving the appellants an undue preference. It is incumbent on the complainant to show, not only that *Ford* was insolvent in fact, but that he intended at the time to take the benefit of the insolvent laws, and the allegation of the bill in that particular, is expressly denied by the answers.

In reference to the questions involved in this case, the principles and decisions upon the bankrupt laws of *England*, and the bankrupt law of the *United States*, of 1800, are applicable to our insolvent system. The bankrupt laws of neither country in terms declare preferences void, but the courts have annulled them as a fraud upon the system, if voluntarily made by the debtor. The policy of the laws in such cases is regarded as invaded. But the same consequences cannot result from an involuntary and coerced preference, brought about by the threats or pressure of the creditor. When the Legislature of *Maryland* was dealing with this subject, they knew the judicial construction of the *English* and *American* bankrupt laws; and with that knowledge, employing as they have done, the same language, they must be supposed to have meant the same thing.

Crawfords and Sellman *vs.* Taylor.—1834.

By the act of 1805, a preference though voluntarily and unduly given was not void, though the debtor thereby forfeited the benefit of the law. It was not until the act of 1812, that such preferences were avoided. The provision in the act of 1805 is penal, and cannot be visited upon a party, for an act extorted from him by threats or coercion. Even if the preference was given, when the debtor supposed he might be compelled to petition, it would not be void, nor would he be deprived of the benefit of the laws, if made under the influence of constraint or importunities. The preferences declared void by the act of 1812, are precisely those which, by the act of 1805, would deprive the party of the benefits of the law. In *England* a preference is protected, which is the result of a mere demand by the creditor. 16 *Serg. and Low.* 88. A payment made upon compulsion, is not a voluntary preference within the meaning of our laws. *Kennedy vs. Boggs*, 5 *Harr. and Johns.* 411. *Hickley vs. Farmer's Bank*, 5 *Gill and Johns.* 381.

The cases in *England* have decided. 1. That the debt paid need not be due at the time. 2. That it is immaterial whether the debtor and creditor did, or did not know of the impending bankruptcy. 3. That no suit need be instituted or threatened, nor that the creditor should be very importunate. If the creditor demanded his money in the ordinary way of business it is sufficient. 16 *Serg. and Low.* 88. 1 *Term. Rep.* 155. 2 *Bos. and Pul.* 580. 11 *East.* 256. 1 *Camp.* 416. 5 *Johns. Rep.* 412.

The answers and proofs in this case abundantly show, that the transfers were made at the pressing solicitation of the appellant. The act of Assembly cannot mean that all payments and preferences shall be void, which are made by a debtor in contemplation of the *mere probability* of taking the benefit of the insolvent laws; because, if that be the rule, then every payment made by a party in insolvent circumstances would be void, as in that case, the subject of such a necessity must occupy his thoughts. 1 *Saund. Pl. and Ev.* 231. 5 *Taunt.* 539. 7 *East.* 544. 3 *Ves.* 87.

To avoid the preference, it is not enough that he thinks he may become an insolvent petitioner, but that such *will* be the case. It might well be argued, that preferences are good in this country, which would not be protected in *England;* as there a man may be declared a bankrupt against his consent, which is not the case in reference to our insolvent system, to which no man against his will can be compelled to resort.

*Mayer* and *Gill*, for the appellees.

1. The act of 1812, *ch.* 77, re-enacted by the act of 1816, *ch.* 221, makes all sales, transfers, &c. void, made with a view to give an improper preference, and in contemplation of insolvency. These are questions of fact, and the Chancellor is to be governed by the same circumstances, and to make the same inferences as would be made by a jury.

2. In reference to the liability of the appellant, it is wholly immaterial whether *Ford* purchased the goods transferred to them, for the purpose of doing so or not. If when the transfers were made he knew he must fail, and handed the goods over to them, to give them an improper preference, contemplating at the time having recourse to the insolvent laws, such transfer is void. The circumstance that the claim of the appellants is for money loaned, does not entitle it to more favor ; because it was by means of these very loans that *Ford's* credit was sustained, and the public imposed on; and to reward them, would be most unjust to the other creditors, who became such in consequence of deceptious appearances which they enabled *Ford* to assume. But in a court of equity, where equality is equity, debts for money loaned and goods sold, are placed upon the same footing.

To defeat a transfer to a favored creditor, it is not necessary that the debtor should have absolutely made up his mind to take the benefit of the insolvent laws. If he contemplate such a course, the transfer is void. 6 *Serg. and Low.* 88. In *England* a preference is good when made

exclusively under the importunities of the creditor, and without the volition of the debtor. But in this case it appears from *Ford's* answer, that he always intended to prefer these creditors, and the application by them therefore, though it fixed the time when the act was done, was not the only inducement which prompted him to do it. If a design to prefer is apparent, it is voluntary, and therefore void, though the creditor may have applied for it. 2 *Bos. and Pul.* 582. 1 *Stark. Rep.* 89. 2 *Bos. and Pul.* 283. 11 *East.* 256. 7 *Ib.* 544. 2 *Cowp.* 634. 3 *Mass. Rep.* 325. That cannot be considered an involuntary preference of one creditor, which would not have been given to another upon a similar application; and it is manifest from the facts in this case, that the other creditors could not have got a preference, by pursuing the course adopted by the *Crawfords* and *Sellman.* The circumstance that the creditor made application, does not *per se* and *proprio vigore* legalize the preference. It may be evidence to support it; but still there may be other circumstances to show the preference to be the spontaneous favor of the debtor. Our insolvent laws look to the equal distribution of the funds of the insolvent among his creditors, and forbid the debtor under the circumstances there enumerated, from paying one creditor at the expense of the rest.

Chambers, J., delivered the opinion of the court.

The appeal from the decision of the Chancellor in these cases, is prosecuted by three of the defendants below, *Hugh* and *William Crawford*, and *James C. Sellman*, and seeks to reverse the decree of the 2d of January, 1833, the report of the auditor, and the order ratifying that report.

The cases were consolidated by an order of the Chancellor, and so far as the decree affects the other parties, *Ford, Franciscus*, and the *Commercial and Farmers' Bank*, it has been acquiesced in. The only questions therefore for the decision of this court, are such as arise out of the transactions of *H.* and *W. Crawford*, and those of *Sellman.* The

two cases are subject to the same consideratons, and the ob-
jections urged apply, if at all, with equal force to both.
The slight variations in their history as detailed in the evi-
dence, are not of a character to affect the legal principles
upon which they depend.

The transfers made by *Ford* to the appellants, are charged
in the bills to have been made, "with a view, or under an
expectation of being or becoming an insolvent debtor, and
with an intent thereby to give an undue and improper pre-
ference," and to be therefore void by the express provi-
sions of the insolvent laws of this State.

The bills assert, and the argument has endeavored to
establish as auxiliary propositions. That *Ford* at the date
of the transfers was in fact unable to pay his debts. That
he well knew his condition ; and that being thus insolvent
in fact, and apprised of his condition, he made the transfer
without solicitation, and of his own mere motion. The
testimony in the cause is submitted as establishing these
allegations, and as proving also, the knowledge by the ap-
pellants of *Ford's* pecuniary situation when the property
was received.

It may be conceded that the testimony does establish the
fact of *Ford's* inability to discharge his debts on the 17th
of May, 1830, the date of the transfers. That his property
at that time was insufficient in value for that purpose. That
*Ford* was perfectly informed of his insolvent condition, and
that the appellants, if they did not certainly know, had ev-
ery reason to apprehend, and did apprehend his embarrass-
ments and failure. There is no ground to contend from
any facts in the case, that actual fraud has been committed
by the appellants and *Ford,* which exclusive of the positive
provisions of the insolvent laws, will vitiate the transfers.
The effort which seems to have been at one time intended
to prove a secret delivery of the property, at unusual
hours of the day, so as to escape observation, has altogether
failed, and the nature, and amount of the claims due the
appellants from *Ford,* and the full and fair value at which
the property was taken, negative all idea of that kind.

The court do not perceive any difficulty in the fact, that large purchases were made by *Ford* within a short period of the transfers. The articles purchased were in the way of his trade, and as is proved, were such as persons pursuing the same business kept in store, and such as at that period of the year were usually purchased by the particular class of customers to whom he principally sold.

The ground mainly relied upon in the argument, and upon which alone any semblance of exception can be urged against the transfers is, that they are in violation of the provisions and spirit of our insolvent laws. It has been justly remarked, that these provisions have been suggested by, and adopted from the *English* bankrupt system. The foundation upon which that system rests is, that a debtor has no right to prefer one creditor to another, when he is honestly and equally bound to pay all. The courts have therefore properly adjudged, that a debtor contemplating an act of bankruptcy shall not, to gratify his personal partialities, select a favorite creditor and secure him, by an assignment of a part of his property, leaving others to share a dividend of what remains, when that favorite creditor had no higher or better claim in law or equity, than the others. But the bankrupt laws, while thus prohibiting to the debtor the *voluntary preference of one creditor to* another, never intended to deny to any, the advantage of an active pursuit of his claim. The maxim, *"vigilantibus, non dormientibus servat lex,"* is as sound and as applicable since, as before the introduction of the bankrupt system. The voluntary assignment to a creditor has universally been considered, "an undue preference," whilst an involuntary assignment is not so. Indeed, the very terms of the rule would seem to exclude from its operation an act not voluntary, for a party cannot be said to "prefer," or "give a preference," by doing an act not the result of his own volition.

The rule therefore, which may be regarded as running through all the cases on those laws is; that a voluntary as-

signment, or an assignment with an intent to give an undue preference to a creditor, by a debtor in contemplation of bankruptcy is void. Some difference may be found to exist in the facts to which the principle of voluntary, or involuntary assignments has been applied, but the rule is distinctly recognized in all the cases. This rule is incorporated in the acts of Assembly constituting the insolvent system of this State. The act of 1812, *ch.* 77, makes void any deed, assignment, &c. to a creditor, by any person, "with a view, or under an expectation, of being or becoming an insolvent debtor, and with an intent thereby, to give an undue and improper preference to such creditor."

Former decisions in this court have concluded the question, as to the meaning and construction of the words, "insolvent debtor," here used. The case of *Hickley vs. Farmers and Merchants' Bank*, 5 *Gill and Johns.* 377, decides, according to the settled construction to which it alludes, that they mean, "taking the benefit of the insolvent laws."

If therefore, the intent to give an undue preference, is to be received as subject to the distinctions which have obtained under the bankrupt laws, between a *voluntary* and *involuntary* transfer or assignment, as we think it should, it will be necessary to the appellees to establish, that *Ford* made the transfers with a view, or expectation of taking the benefit of the insolvent laws, and also that he voluntarily made these tranfers, to prefer the appellants. We do not think either of these positions are established by the facts and circumstances in the case. There is no evidence to prove, that he had the expectation of being an insolvent petitioner in point of fact. He had before been embarrassed, and had failed, without resorting to such a means of relief. He surrendered to his creditors the property which remained in his hands, and acted as if he seriously desired and expected their acquiescence to his proposed arrangement with them. He knew that such an arrangement was usual, and as his misfortunes were the result of accidents, over which he could exert no control; the failure of the

fisheries on the *Susquehanna* for several successive years, and no dishonesty or extravagance appears to be chargeable to him, we cannot adopt the suggestion of the appellee's counsel, that he could look to no other event, but to be driven to the alternative of becoming an applicant for the benefit of the insolvent laws, or of lying in jail. His examination before the commissioners has been used as evidence in this case, by consent, and denies, as his several answers to the several bills in Chancery also denies, that he had such a view or expectation, nor do we find the testimony of any witness to impeach this statement.

While pursuing his effort to obtain a release by arrangement with his creditors, he was availing himself of every means in his power, and calling upon such friends as he could enlist, to avert the proceedings of his creditors at law, and did in fact, by adjusting the most pressing demands upon him, keep himself from being taken in execution until the 1st of January following, being more than seven months after it is supposed he indulged the view and expectation of petitioning, and being also after all hope of compromise with a large part of his creditors was at an end.

Nor do we regard the transfers as voluntarily made. In the case of the *Crawfords*, the advances were made under circumstances very peculiar. At a moment of most pressing necessity, when the immediate use of money was of the last importance to his credit, and when by the testimony of two of the witnesses he could not obtain it elsewhere, he received a loan from them on the most solemn pledge, which could bind his honor and his conscience, to secure this, and all their other advances, whenever, and however they might demand. They did afterwards demand it, and were urgent and pressing for payment, and prescribed the particular mode, and the particular time for the redemption of his pledge; neither the time nor the mode, being inconsistent with his ability or his obligation. He paid them not all that he was indebted, but to the amount that he had

pledged—the amount of their loans; and paid them in goods at a fair and full value, and indeed at a price of which they complained, and at which they were not able to sell them afterwards.

In *Sellman's* case, there is no proof of such a solemn pledge previously given, but it was for a debt of precisely the same kind as *Crawford's*, and when *Sellman* insisted on being paid, as one of the witnesses has said was, "urgent and pressing for payment, or security," he satisfied so much of *Sellman's* debt as arose from loans, in the same manner as he had satisfied *Crawford's*, leaving each of them other debts still unpaid, which arose in the usual and ordinary transactions between them as merchants.

It has been said that these appellants never would have been paid, except for the peculiar relation in which they stood to *Ford*. But this does not vitiate the payment. A man may yield more readily to the solicitation of a creditor, to whom he is under peculiar pecuniary obligations, and it is perfectly probable that *Ford* was gratified to have an opportunity to place these peculiar debts in a state of comparative security. But there is not in the whole testimony one solitary fact, that goes to show he ever moved in the matter, or suggested to him the necessity of making a demand upon him; nor indeed is there the least evidence of his intention to do this, or any other act, which should make it necessary for him to discontinue his business and trade, or to diminish its extent, until the appellants required of him the delivery of so much of his stock of goods, as was necessary to discharge their claims.

It was also strongly insisted, that the notes on which the appellants were liable for the advances made to *Ford* were not due. The cases referred to in the argument, show that this is not material. The creditor is entitled to use vigilance and obtain security, as well before as after the debt is payable, and it was expressly a part of the contract with the *Crawfords*, to secure them at *any time*, as well as in any mode they might require.

**DECREE REVERSED, AND BILL DISMISSED WITH COSTS.**